IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-40857
_____


PERRY L. BIRD,

                                        Plaintiff-Appellant,

                    versus

SIMPSON INVESTMENT; SIMPSON
PAPER CO.; SIMPSON PASADENA
PAPER COMPANY,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court for the
Southern District of Texas, Galveston
(G-95-CV-359)
_____
July 15, 1997

Before REAVLEY, JOLLY, and BENAVIDES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:[*]

     Perry L. Bird sued his employer, Simpson Pasadena Paper

Company, and related companies (collectively "Simpson"), raising

claims of age discrimination, disability discrimination, illegal

retaliation and intentional infliction of emotional distress.  The

district court granted Simpson's motion for summary judgment, and

Bird appeals.  Because we find that Bird presented sufficient

summary judgment evidence to raise material issues of fact with

_____

     [*]Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

respect to his age and disability discrimination claims, we reverse. We affirm the district court's dismissal of Bird's claim for intentional infliction of emotional distress.

I

Bird was first employed at the Pasadena, Texas paper mill by Champion International Paper Company in 1970. Simpson acquired Champion in 1987, and retained Bird in his position as supervisor of the mobile equipment shop for the Pasadena mill. At the time, Bird was fifty-two years old, and suffered from chronic osteomyelitis as the result of a 1973 motorcycle accident.[1]

As the mobile equipment supervisor, Bird supervised the in-plant shop responsible for maintaining and repairing mobile equipment at the mill. As a part of his job as an in-plant maintenance shop supervisor, Bird was required on occasion to work "outages," as were the three other maintenance shop supervisors. Outages were brief periods when certain production machines would be temporarily shut down for the purpose of repairs and maintenance. In order to keep the shut-down period to a minimum, the crews working outages worked long shifts, sometimes more than twelve hours, during the outage. Outage work also required a significant amount of standing, walking and climbing.

_____

[1]Because this appeal concerns a motion for summary judgment, we construe the facts in the light most favorable to Bird. Simpson disputes several of Bird's factual allegations.

Bird's osteomyelitis, when aggravated by excessive standing or walking, causes his leg to swell and drain fluid; the condition also causes severe pain. Because of his leg ailment, Champion provided Bird with a handicapped parking space. Simpson continued this practice. In 1988, shortly after taking over the plant, Simpson purchased a four-wheeled scooter for Bird to use when traveling within the plant.

In 1993, Simpson offered early retirement packages to salaried employees who were fifty-seven years old or older. Bird was then fifty-eight years old. Bird states that two superiors, his immediate supervisor, Don Cupp, and the maintenance manager, Jose Ramos, strongly suggested that he accept the early retirement package. Bird stated that after he declined, Cupp and Ramos began to schedule him for increasing numbers of outages. Because the outage work severely aggravated Bird's osteomyelitis, Bird asked Cupp and Ramos not to assign him to so many outages. Bird stated that he even showed Cupp the aggravated condition of his leg, to which Cupp allegedly responded that he had seen Bird's leg before, and, as for the outages: "That's your job. If you don't do it, go home." Bird stated that, on other occasions, Ramos responded similarly.

In January 1994, Simpson began a reduction in force program to reduce the number of workers at the Pasadena mill. Simpson offered

voluntary severance packages to thirty-one employees on a first-come, first-served basis. Employees were informed that after the severance period, the mill would be restructured and employees could apply for jobs during the restructuring. Those who did not obtain positions during the restructuring would be terminated.

Bird did not want to accept the severance package. However, Bird stated that Ramos, the maintenance manager, urged Bird to accept the package, and told him that if he did not apply for the voluntary severance, he would be terminated and end up with no job and no severance package--that Bird would "lose it all" if he did not sign up. Bird stated that Cupp also recommended that he apply for the severance package. Because Ramos was a member of the "Mill Leadership Team" responsible for the restructuring, Bird became afraid that he would lose his job and applied for the severance, but more than thirty-one other employees had already applied. After speaking with a different manager who assured Bird that the mobile equipment supervisor position would be retained in the restructured mill, Bird decided to withdraw his name from the wait list for severance packages.

Later in January, Simpson posted descriptions of the positions available in the restructured mill. "Job 193" was posted as "Mobile Equipment Supervisor." Under the heading "this position replaces/incorporates," Job 193 was listed as an "existing

4

position."  The posting indicated that the functions of the position would be:

> Supervise activities of the maintenance support functions (i.e. mobile equipment, machine shop, etc.) to improve equipment performance, meeting quality, cost, productivity, safety and housekeeping standards. Responsible for working with Maintenance employees assigned to this area and building a team atmosphere and effort within his crew. Responsible to develop people to utilize crew concept during incumbent's absences.

Bird states that the position described was nearly identical to the job he was then performing as supervisor of the mobile equipment shop.

Four individuals applied for Job 193:  Bird, JoAnn Atkinson, the pump shop supervisor, Jesse Hayter and Betty Wall.  Bird was then fifty-nine years old.  Applicants were evaluated in a "360-degree" evaluation in which the applicant's supervisor and three co-workers, selected by the applicable job selection committee, completed written evaluations of the applicant's skills in five categories.  Applicants were also interviewed by a panel of managerial employees.

The results of these first two stages were evaluated and translated into numerical scores.  These scores and the candidates' applications were then submitted to the "job selection committee" for the particular job, which made the final decision.  The job selection committee discussed the candidates, and rated each candidate in five standardized categories: (1) qualifications for

5

the new position, (2) experience in the specific position or one that was closely related, (3) abilities and strengths, (4) performance in the current position, and (5) total company service.

The records provided by Simpson indicate that Atkinson, a forty-eight year old female employee, scored higher on both the 360-degree evaluation and the managerial interview. A letter from Simpson to the EEOC states that, of the four candidates, Bird received the second highest score on the 360-degree evaluation. The managerial interview, in which Atkinson scored a 2.71 and Bird scored a 1.83, was relevant only to the "abilities and strengths" category. In the final scoring by the job selection committee, Bird and Atkinson received identical scores in four of the five categories described above. Both received the highest possible score in qualifications, specific experience, and total company service. Both received the second highest possible score for current performance. In the "abilities and strengths" category, however, Atkinson received a score of "4" while Bird received a score of "0." In March 1994, Atkinson was awarded Job 193.

Bird was not immediately terminated, however. Instead, Simpson asked Bird to remain and to train Atkinson. Bird states that the curtailment date he was given was changed several times. His duties continued to aggravate his leg condition. In June, Bird's doctor informed him that he was in danger of losing his leg,

and that he could not continue to work.  Bird went on thirty days'
sick leave on June 16, 1994, and was formally terminated as of
June 30, 1994.

II

Bird filed suit against Simpson in federal district court on
June 20, 1995.  Bird raised claims for age discrimination under the
Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et
seq.*, for disability discrimination under the Americans with
Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, for
retaliation under Title VII of the Civil Rights Act of 1964,
42 U.S.C. § 2000e-3, and for the intentional infliction of
emotional distress under Texas law.  Bird sought backpay and
benefits, frontpay and benefits, compensatory damages for pain and
suffering, punitive damages for intentional discrimination and
attorney's fees and costs.

On June 3, 1996, before the conclusion of discovery, Simpson
moved for summary judgment on all claims.  The district court
granted the motion for summary judgment, and dismissed Bird's
claims with prejudice.  Bird now appeals the decision granting
summary judgment on his age and disability discrimination claims,
and his claim for the intentional infliction of emotional

distress.[2]  Bird argues that his evidence tended to show both that Simpson's legitimate, nondiscriminatory explanation for selecting Atkinson was pretextual, and that Simpson was hostile to Bird because of his age and his disability.  Bird additionally appeals the district court's decision to deny Bird's request to supplement the summary judgment record with transcript evidence from depositions taken by Simpson after the summary judgment motion was filed.

---

[2]Bird does not appeal the district court's decision granting summary judgment on his claim for retaliation in violation of Title VII, 42 U.S.C. § 2000e-3.

III

A

We review the district court's decision granting summary judgment *de novo*, construing all facts in the light most favorable to the non-movant. Ray v. Tandem Computers, Inc., 63 F.3d 429, 433 (5th Cir. 1995); Moore v. Eli Lilly Co., 990 F.2d 812, 815 (5th Cir.), cert. denied, 510 U.S. 976, 114 S.Ct. 467 (1993)).

B

Turning to the summary judgment record in this case, we conclude that the district court erred in granting Simpson's motion for summary judgment. Bird has established a *prima facie* case of age discrimination and of disability discrimination. Furthermore, beyond the *prima facie* case, Bird has presented sufficient summary judgment evidence to raise a factual dispute concerning whether Simpson's proffered explanation is pretextual.

(1)

In assessing Bird's *prima facie* case, we first address Simpson's argument that this case must be considered a "reduction-in-force" case rather than a "replacement" case. Simpson argues that because Bird lost his job in the context of a plant-wide reorganization, the question whether he has established a *prima facie* case must be analyzed under the somewhat different

requirements that have been established for layoffs cause by reductions-in-force.

To establish a *prima facie* case of age discrimination in the typical case, the plaintiff must show that:

> (1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of the discharge; and (4) he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age.

Rhodes, 75 F.3d at 992 (quoting Bodenheimer v. PPG Industries, Inc., 5 F.3d 955, 957 (5th Cir. 1993)).

We have, however, stated the test somewhat differently in "reduction-in-force" cases. In such cases, we have stated that the plaintiff must meet the first three requirements, and then must offer "evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue." Amburgey v. Corhart Refractories Corp., Inc., 936 F.2d 805, 812 (5th Cir. 1991). Simpson argues that this standard must be applied to Bird's case, and that it requires Bird to show that Simpson did not treat age neutrally, or regarded age as a negative factor.

Simpson's argument, however, misunderstands the rationale behind the different approach in reduction-in-force cases. The typical *prima facie* case requirements must be modified in that

10

context principally because "reduction-case plaintiffs are simply laid off and thus [are] incapable of proving . . . actual *replacement* by a younger employee." Amburgey, 936 F.2d at 812 (quoting Thornbrough v. Columbus and Greenville R.R. Co., 760 F.2d 633, 642 (5th Cir. 1985)) (internal quotations omitted) (emphasis in original).

Although Simpson's two reorganizations did reduce the Pasadena mill's workforce by approximately twenty percent, Bird's claim is properly analyzed under the traditional *prima facie* case requirements. We have stated that the elements of the *prima facie* case "are not Platonic forms, pure and unchanging:  rather, they vary depending upon the facts of a particular case." Amburgey, 936 F.2d at 812.  In its facts, Bird's case is more analogous to a failure-to-hire or a failure-to-promote situation than to a reduction-in-force.  The underlying basis of Bird's case is his assertion that Simpson awarded Job 193 to Atkinson rather than to him because of his age and/or his disability.  In Bird's theory of the case, Atkinson is the employee whom Simpson favored over Bird because of discriminatory motives.

(2)

Identifying Atkinson as the employee who "replaced" Bird, Bird has plainly established a *prima facie* case of age discrimination. Bird was within the protected class and applied for Job 193.  Bird

11

did not receive Job 193, which went to a younger person. Although Simpson obviously disputes Bird's qualifications, Bird was "qualified," within the meaning of the second element of the *prima facie* case. Job 193 was very similar to the job Bird had been performing for many years; indeed, Job 193 initially bore the exact title of Bird's job and was posted as an "existing position." Bird possessed all of the objective criteria listed in the job posting sheet, and was asked to help train Atkinson for her new position.

Bird has similarly established a *prima facie* case of disability discrimination. To establish a *prima facie* case of disability discrimination, a plaintiff must show: (1) that he suffers from a "disability" within the meaning of the ADA; (2) that he was qualified for the position that he held or desired; (3) that he was subject to an adverse action; and (4) that he was replaced by a non-disabled employee or was treated less favorably than non-disabled employees. Daigle v. Liberty Life Ins. Co., 70 F.3d 394, 396 (5th Cir. 1995).

The parties do not dispute that Bird's leg ailment is a "disability" under the ADA, and we assume that this requirement has been met. Bird has also shown that he suffered an adverse employment action in being rejected for Job 193, and that the position was awarded to a non-disabled employee. However, Simpson argues that Bird cannot show that he was a "*qualified* individual

12

with a disability."  Simpson argues that because Bird stated in various applications for disability benefits that he was "totally disabled" and "unable to work," Bird should be judicially estopped from asserting that he is qualified to perform the essential functions of Job 193.  We reject this argument because the record shows that Bird was not unable to perform his job in March 1994, when the adverse action was taken, nor did he claim to be.[3]

(3)

In the McDonnell Douglas burden-shifting format, once Bird has established a *prima facie* case, a rebuttable presumption of

---

[3]Simpson's estoppel argument is based upon insurance and disability forms that Bird completed.  In his internal employee disability form, dated November 30, 1994, Bird answered "yes" in response to a question that asked "are you now totally disabled and unable to work."  In this same form, however, Bird clearly indicates that the condition dates back through many years of satisfactory employment, and that the duration of his total disability is "unknown."  In other documents cited by Simpson, Bird's doctor indicated that Bird was unable to continue working in his prior job "*because of excessive walking and climbing*."  The doctor also states that the duration of the disability is "unknown."

All of these forms were completed *after* June 15, 1994, when Bird went on disability leave after being warned by his doctor that he had abused his leg and was in danger of losing it.  It appears clear from the record that *after this date*, Bird was completely disabled and therefore not "qualified" within the meaning of the ADA.  However, the decision to award Job 193 to Atkinson rather than Bird was made in March 1994, at which point Bird did not claim to be totally disabled, and was, in fact, performing his job, continuing to work on outages, and even began training Atkinson.  Bird's state of total disability in June 1994, particularly if he *remains* unable to work, is relevant to the question of damages, but cannot be used to estop Bird from pursuing his ADA claim.

13

discrimination is established, and Simpson must articulate a legitimate, nondiscriminatory reason for selecting Atkinson over Bird for Job 193. Simpson offers the explanation that Atkinson scored higher than Bird in both the "360-degree" evaluation and the managerial interview. These results contributed to Atkinson's scoring higher than Bird in the "abilities and strengths" category of the final evaluation. Atkinson was awarded Job 193 because she had the highest total score from the five categories of the final evaluation. Additionally, a member of the job selection team stated that Bird's score of "0" disqualified him from consideration.

(4)

The burden therefore returns to Bird to offer evidence demonstrating that the employer's explanation is "unworthy of credence," or that illegal discrimination "more likely" motivated the employer's decision. Burdine, 450 U.S. at 256, 101 S.Ct. at 1095. The fact that a *prima facie* case has been established is not enough, although the underlying evidence supporting the *prima facie* case remains relevant. While it is true that the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-7, 106 S.Ct. 1348, 1356 (1986), at the

14

summary judgment stage, the district court may not make credibility determinations or reject relevant evidence as unpersuasive.

Bird submitted a variety of affidavits and deposition transcripts in response to the summary judgment motion. Bird submitted a highly complimentary 1986 performance review,[4] which indicated that he was "cost and quality conscious," effective at negotiating with outside suppliers, had "an excellent working relationship with both hourly and supervisory shop personnel," and had outstanding mechanical expertise. Bird submitted *many* additional affidavits from subordinates and superiors that also praise Bird's high level of technical understanding and mechanical expertise, his negotiating ability, and his communication and leadership skills. Other affidavits indicated that Atkinson had little or no technical or mechanical knowledge, and therefore had difficulty supervising mechanical repairs. The former mill manager, Henry Jones, stated in his affidavit that Atkinson's

[4]Although a 1986 review might be considered outdated under other circumstances, Simpson was unable to locate any more recent written evaluations in response to Bird's discovery request. A Simpson employee who had supervised Bird apparently stated during his deposition that he had completed performance appraisals of Bird, but no appraisals for the period during which Simpson owned the plant were produced. Counsel for Simpson stated at a hearing before the district court that "[i]t appears that there were no evaluations." Interestingly, the affidavit of the former mill manager indicates that annual performance appraisals were mandatory under Simpson policy. The manager further stated that he recalled seeing evaluations for Bird, and never saw an "unsatisfactory" rating.

performance as supervisor of the roll grinding shop was unsatisfactory, and that he therefore eliminated her responsibility over that shop. Bird also submitted copies of the first two postings for Job 193,[5] which clearly seek significant mechanical knowledge and experience.

Other affidavits confirm Bird's statement that he was required to work most of the outages in 1993 and the first half of 1994, and that the other maintenance shop managers did not work nearly as many outages as Bird. One employee stated that Bird told him he had asked Cupp and Ramos for relief from the outage duty, but they had told him it was his job. The employee also stated that he "knew Bud [Bird] was worried [about keeping his job] because Jose Ramos had been pushing him to take severance . . . I was not present when Jose made those statements but, Bud told me that Jose had told him to take the severance because Bud was going to lose his job." Bird's own affidavit and deposition transcript repeat his assertions that Cupp and Ramos refused to accommodate his disability by reducing his outage work, and that they pushed him to take early retirement because if he did not he would "lose it all."

Most interestingly, Bird also submitted the affidavit of Betty McIntosh, an employee who was supervised by Atkinson at the time of

---

[5]Simpson was apparently unable to provide a copy of the third posting during discovery.

16

the reorganization. McIntosh states that, on the final day to submit applications for the restructured jobs, Atkinson told her that John Schurman, a managerial employee involved in the restructuring, had "told her to bid on 'Bud's job.'" Atkinson reportedly said "the goddamned son of a bitch he is going to make me do it again . . . he is going to make me take it." McIntosh stated that Atkinson had told her that she did not want "Bud's job" and that "she really wanted the stores supervisor job or a job in purchasing.[6]

Finally, Bird offered summary judgment evidence concerning the final analysis prepared by the job selection team for Job 193. That "team," the individuals who were responsible for completing ratings of the four candidates that would determine who received Job 193, included Schurman, Ramos, and one other individual. Bird and Atkinson received identical scores in (a) qualifications for

---

[6]Although credibility determinations are inappropriate at the summary judgment stage, we note that Atkinson's bid sheet for restructured jobs supports Bird's claim that she was told to apply for Job 193. Atkinson's entire bid sheet is neatly typed, and the line for position desired is marked with the words "see attached listing." The attached listing, also typed, identifies the stores supervisor job as the first choice, followed by purchasing agent jobs and other selections. However, the position desired line *also* contains handwritten scribbles to the side. These handwritten marks appear to insert Job 193 and one other choice in front of the other positions that were listed on the attached sheet. Atkinson's own affidavit states without elaboration that she "applied for and received the job of mobile equipment supervisor," but she does not deny making the statements that McIntosh described.

17

the new position, (b) experience in the specific position or a closely related position, (c) performance in the current position, and (d) total company service.  In the fifth category, "abilities and strengths," Atkinson received a "4" rating, while Bird received a "0" rating.  Schurman stated in his deposition that the first two stages of the application procedure, the "360-degree" evaluations and the managerial interview, were relevant only to the "abilities and strengths" category, and that those scores were only part of the picture that the team considered in its discussion of how to rate each candidate in "abilities and strengths."  Thus, the ratings for Bird and Atkinson in the decisive "abilities and strengths" category were left largely to the discretion of Schurman, Ramos, and the other member of the job selection team.

This evidence, particularly when combined with the evidence concerning Cupp and Ramos' efforts to push Bird to retire, and their refusal to reduce the number of his assignments to outage duties, is sufficient to permit Bird to take his claims to the trier of fact.[7]

C

---

[7]Because we find that Bird has offered substantial evidence that questions the legitimacy of the "objective" selection process for Job 193, we make no comment on whether Bird's evidence of alleged animosity toward age or disability would suffice in the absence of the pretext evidence.

18

Bird also appeals the district court's decision to grant Simpson's motion for summary judgment on his claim for intentional infliction of emotional distress. Bird argues that Simpson's actions in awarding Job 193 to Atkinson rather than Bird, was demoralizing and left him depressed. In his deposition, Bird stated:

> I mean, you work for a job 25 years or 30 years, and that same type of work for 30 some odd years, worked there since 1970, and then all at once you're not qualified anymore, that you can't do your job and someone with less qualifications than you had got your job, you kind of wonder what's happened? You know, what is going on here? And you know, you go out here, you can't look for a job because you don't even have--you don't have enough self-esteem to even ask for it. They have demoted you so much and then criticized you and downsized you so much, how do you go ask for a job?

Bird argues that the elements of a claim for the intentional infliction of emotional distress are satisfied because (1) Simpson intentionally discriminated against him on the basis of his age and disability, (2) that Simpson's conduct was 'extreme and outrageous," and (3) that Simpson's conduct caused him to suffer severe emotional distress.

Pendant claims for the intentional infliction of emotional distress are common in employment discrimination lawsuits. To sustain a claim, the conduct complained of must go beyond mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Wilson v. Monarch Paper Co., 939 F.2d 1138,

19

1143 (5th Cir. 1991) (citing Restatement (Second) of Torts § 46). The Texas Supreme Court has stated that the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Randall's Food Markets, Inc. v. Johnson, 891 S.W.2d 640, 644 (Tex. 1995) (internal quotations and citations omitted). We have previously observed that the typical conduct alleged in employment discrimination cases, including demeaning comments, unfair criticism, demotion, termination or other harassment, is not sufficiently "extreme and outrageous," however deplorable it may be. This is true even where the evidence suggests that those acts are based upon an illegitimate factor such as race, age or disability and are therefore *illegal*. Wilson, 939 F.2d at 1143.

In Wilson, we indicated that there must be something that goes beyond mere workplace harassment to support a claim for the intentional infliction of emotional distress. In Dean v. Ford Motor Company, 885 F.2d 300, 306-307 (5th Cir. 1989), for example, in addition to harassment such as unfair work assignments, being transferred from desk to desk, and being subjected to demeaning performance reviews, a supervisor placed blank company checks into the plaintiff's purse in a scheme to make it appear that the plaintiff was a thief. We held that these actions "[took] this

20

case beyond the realm of an ordinary employment dispute and into the realm of an outrageous one." Id. at 307. In Wilson, we found that "the degrading and humiliating way that [Wilson] was stripped of his duties and demoted from an executive manager to an entry level warehouse supervisor with menial and demeaning duties," was sufficiently outrageous to sustain a claim.

Bird points to the fact that he was a "devoted and valuable" employee who loved his job, and that replacing him with a person who did not have his skills and demanding that he train her was outrageous and intolerable, and "eroded his self-esteem and sense of worth." Yet these actions are no more "outrageous" than any other claim that an adverse action has been unfairly taken against an employee because of illegal discrimination.

The only atypical factual allegation to which Bird points is his assertion that Cupp and Ramos refused to accommodate his disability by reducing his outage duty, even though "Bird's suffering was apparent." Although his supervisors' refusal to reduce his outage duties may have been callous, their refusal of Bird's request is not the sort of "extreme and outrageous" conduct that will satisfy the legal requirements for a claim of intentional infliction of emotional distress.[8]

---

[8]Bird does not allege that Cupp and Ramos *intended* to cause permanent damage to Bird's leg. Such an allegation would be implausible, considering that Bird himself was not aware of the

21

In conclusion, we find that the district court erred in granting summary judgment on Bird's termination claims for age discrimination in violation of the ADEA, and for disability discrimination in violation of the ADA.[9] Bird submitted adequate summary judgment evidence from which a reasonable trier of fact could conclude that Simpson's proffered "legitimate, nondiscriminatory explanation" was unworthy of credence. That evidence, combined with the elements of the *prima facie* case and other evidence suggesting that Simpson was hostile to Bird because of his age or disability, would permit a jury to infer that the real reason that Simpson selected Atkinson over Bird was a desire to force Bird out because of his age or disability. As for Bird's claim for intentional infliction of emotional distress, we find that the district court properly granted Simpson's motion for summary judgment on that claim.[10]

----

serious risk to his leg until June 1994.

[9]In response to questioning during oral argument, counsel for Bird asserted that Bird has raised the failure to accommodate as an independent ADA violation. Our review of the complaint and Bird's response to Simpson's motion for summary judgment leaves us somewhat skeptical of this point. The district court has not addressed this issue, and we leave the question of the proper construction of the pleadings to the district court in the first instance.

[10]Our conclusion that the district court erred in granting summary judgment on Bird's ADEA and ADA claims makes it unnecessary

AFFIRMED in part, REVERSED in part, and REMANDED.

---

for us to consider whether the district court abused its discretion in refusing to consider Bird's motion to supplement his summary judgment response with transcript evidence from depositions taken after the motion for summary judgment was filed. The evidence in question principally concerns the process by which Simpson allegedly revised Job 193 to better fit Atkinson's qualifications and capabilities; no new factual allegations in support of Bird's intentional infliction of emotional distress claim are offered.

We observe, however, that although the district court's response to the motion in question was severe in its criticism of Bird's counsel, the district courts enjoy broad discretion in responding to rules violations and other procedural transgressions. We note that counsel's inaccurate and misleading citations to the summary judgment record became a source of significant frustration to the district court, and we observe that this questionable conduct has continued in counsel's brief on appeal. As only one example, on page 11 of the appellant's brief, the court is informed that "Bird was told he would have to work as long as Simpson wanted to obtain the six month severance pay that Simpson was awarded each terminated employee." Counsel cites to the record at 898-899, and to the record excerpts at tab 23. Only one of the four pages cited even *refers* to severance pay--a reference that is found in counsel's question rather than the witness' answer--and it does not support the proposition cited. Counsel is *strongly* cautioned that such behavior cannot be condoned, and certainly will not be tolerated by the district court upon remand.